**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| AMELIA WILMER, TONI WARNOCK, VIVIAN SINGER, and ZACKARY SINGER, individually and on behalf of all others similarly situated, | **CIVIL ACTION NO.:** |
| Plaintiffs, | |
| v. | |
| MARSH & MCLENNAN COMPANIES, INC, | |
| Defendant. | |

**CLASS ACTION COMPLAINT**

Plaintiffs, Amelia Wilmer, Toni Warnock, Vivian Singer, and Zackary Singer ("Plaintiffs"), by and through their attorneys, on behalf of the Marsh & McLennan Companies, Inc. Group Benefits Plan (the "Group Plan"), and the Marsh & McLennan Companies, Inc. Health & Welfare Benefits Program (the "Welfare Plan") (collectively, the "Plans")[1] themselves and all others similarly situated, state and allege as follows:

## I. INTRODUCTION

1. This is a class action brought pursuant to §§ 409 and 502 of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1109 and 1132, against the Plans' fiduciary, Marsh & McLennan Companies, Inc. ("Marsh" or the "Company") for breaches of its fiduciary duties.

---

[1] The Plans are legal entities that can sue and be sued. ERISA § 502(d)(1), 29 U.S.C. § 1132(d)(1). However, in a breach of fiduciary duty action such as this, the Plans are not a party. Rather, pursuant to ERISA § 409, and the law interpreting it, the relief requested in this action is for the benefit of the Plans and their participants.

2. Plaintiffs bring this action to redress prohibited transactions and self-dealing in violation of 29 U.S.C. § 1106(b) by Marsh, which acted as a fiduciary to the Plans in connection with the selection, marketing, and placement of voluntary benefits and the receipt of compensation derived from participant-paid premiums. As explained below, Marsh exercised fiduciary authority to select and maintain insurance arrangements for the Plans from which Marsh itself received millions of dollars of compensation; Marsh participated in determining the amount and structure of that compensation.

3. The Plans are an employee welfare benefit plan governed by ERISA, 29 U.S.C. § 1002(1), that offered voluntary benefit products to Plan participants, including but not limited to life insurance, vision, long-term disability, accidental death and dismemberment, legal, and other similar coverages funded through payroll-deducted, participant-paid premiums.

4. In the voluntary benefits market, insurance carriers do not set premium rates independently and then separately negotiate broker compensation.[2] Rather, the process works in reverse. Marsh, as the broker, specifies the commission structure. That structure can be a "heaped" commission (a high first-year payout followed by lower renewal rates) or a "level" commission (a consistent percentage paid every year).[3]

5. As the broker, Marsh also sets the benefits administration fee, an additional cost that compensates Marsh for consulting, providing ongoing services, additional commission or compensation and for enrollment firms (specialized third-party companies that manage

---

[2] *See* Mployer Team, *Insurance Broker vs. Carrier* (Updated August 14, 2023), https://mployeradvisor.com/blog/insurance-broker-vs-carrier ("this commission is built into the premiums paid by policyholders every month. Thus, it's not a separate payment, but included in the price of the policy purchased through the broker.").

[3] *See* Trevor & Heather Garbers, The Commission Conundrum (March 2023), https://issuu.com/voluntary-advantage/docs/vb_voice_-_march_2023/6?e=8&o=1.

communication, education, technology and sign-up process) for technology platforms and enrollment support services.

6. The insurance carrier will include the commission and administration fee into the premium rate structure that participants pay. In doing so, the insurance carrier prices the product to achieve its target profitability after accounting for any commissions, the administration fees, its own administrative costs, and its profit margin. Thus, in the instant case, the participants' premium payments are a direct function of Marsh's compensation demands. When Marsh demands more, the carrier charges more, and participants pay more.

7. Defendant, while acting with respect to the management or disposition of Plan assets, engaged in self-dealing by setting, collecting and retaining commission compensation and administration fees out of Plan assets, in contravention of ERISA.

8. Defendant failed to avoid self-dealing and conflicts of interest, and failed to ensure that any compensation received from dealing with the Plans complied with ERISA's strict prohibitions under 29 U.S.C. § 1106(b), including by obtaining appropriate authorization and ensuring that any compensation did not result from Defendant acting in any transaction involving the Plans on behalf of a party whose interests were adverse to those of the Plans and their participants.

9. Defendant's compensation structure and receipt of commissions and administration fees influenced or had the tendency to influence its recommendations and actions regarding the selection, marketing, and placement of voluntary benefits, and the level and cost of those benefits to participants.

10. Plaintiffs, on behalf of themselves, the Plans, and the class of similarly situated Plan participants, seek equitable relief including restitution and disgorgement of ill-gotten commissions and profits, pursuant to 29 U.S.C. § 1132(a).

11. Based on this conduct, Plaintiffs assert claims against Defendant for engaging in ERISA's prohibited transactions (Count I), and breach of the fiduciary duty of loyalty (Count II).

## II. JURISDICTION AND VENUE

12. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because it is a civil action arising under the laws of the United States, and pursuant to 29 U.S.C. § 1132(e)(1), which provides for federal jurisdiction of actions brought under Title I of ERISA, 29 U.S.C. § 1001, *et seq*.

13. This Court has personal jurisdiction over Defendant because Defendant transacts business in this District, resides in this District, and/or has significant contacts with this District, and because ERISA provides for nationwide service of process.

14. Venue is proper in this District pursuant to 28 U.S.C. § 1391 because the Plans are administered in this District, the alleged breaches took place in this District, and/or Defendant may be found in or transacts business in this District.

## III. PARTIES

### Plaintiffs

15. Plaintiff Amelia Wilmer ("Wilmer") resides in Boones Mill, Virginia. Plaintiff Wilmer is a participant and beneficiary of the Plans, and paid premiums for voluntary benefit products placed and administered with the involvement of Defendant, including vision and accidental death and dismemberment.

16. Plaintiff Toni Warnock ("Warnock") resides in Perry, Iowa. Plaintiff Warnock is a participant and beneficiary of the Plans, and paid premiums for voluntary benefit products placed and administered with the involvement of Defendant, including life insurance, vision, and accidental death and dismemberment.

17. Plaintiff Vivian Singer ("V. Singer") resides in Cedar Park, Texas. Plaintiff V. Singer is a participant and beneficiary of the Plans, and paid premiums for voluntary benefit products placed and administered with the involvement of Defendant, including vision and accidental death & dismemberment.

18. Plaintiff Zackary Singer ("Z. Singer") resides in Cedar Park, Texas. Plaintiff Z. Singer is a participant and beneficiary of the Plans, and paid premiums for voluntary benefit products placed and administered with the involvement of Defendant, including vision, accidental death & dismemberment and long-term disability.

19. Plaintiffs have standing to bring this action on behalf of the Plans because they participated in the Plans, paid premiums for voluntary benefit products, and were injured by Defendant's unlawful conduct.

20. Plaintiffs did not have knowledge of all material facts necessary to understand that Defendant breached its fiduciary duties and engaged in other unlawful conduct in violation of ERISA until shortly before this suit was filed.

**Defendant**

21. Marsh & McLennan Companies, Inc. is the sponsor and a named fiduciary of the Plans with a principal place of business at 1166 Avenue of the Americas, New York, New York. *See* 2024 Form 5500s for the Plans, at 1-2. Marsh engages in brokerage and consulting services related to employee benefit plans, including voluntary benefits plans.

22. At all relevant times, Marsh acted as a fiduciary within the meaning of 29 U.S.C. § 1002(21)(A) with respect to the Plans and/or Plan assets by, among other things, exercising discretionary authority or control over Plan management or assets, and/or having discretionary authority or responsibility in Plan management and administration.

23. Marsh occupied both sides of the voluntary benefits transactions. In its capacity as Plan sponsor and fiduciary, Marsh exercised authority and discretion concerning which carriers and products would be made available through the Plans and on what terms. At the same time, in its capacity as broker and benefits consultant, Marsh stood to receive commissions and other compensation generated by the very insurance arrangements that it selected, recommended, retained, and administered for the Plans.

24. Upon information and belief, Marsh also exercised authority or influence over the amount and structure of the compensation payable to itself, including whether compensation would be paid as a level commission, a heaped commission, a flat annual commission, an administration fee, or another form of carrier-paid or premium-funded compensation. Thus, Marsh was not merely collecting compensation fixed in advance by an independent fiduciary in an arm's-length transaction; rather, it had the ability to affect the compensation it would receive through decisions concerning the Plans' voluntary benefit arrangements.

25. Accordingly, Marsh during the putative Class Period is/was a fiduciary of the Plans, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A).

## IV. CLASS ACTION ALLEGATIONS

26. Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of themselves and the following proposed class ("Class"):[4]

> All persons who were participants in the Plans, and who were participants in voluntary benefit products placed and administered with the involvement of Defendant at any time between September 25, 2020 through the date of judgment (the "Class Period").

27. The members of the Class are so numerous that joinder of all members is impractical. At the start of the Class Period, the Group Plan had 18,402 participants (*see* 2020 Form 5500 for the Group Plan, at 2) and the Welfare Plan had 19,731 participants. *See* 2020 Form 5500 for the Welfare Plan, at 2. By 2024, the Group Plan had 18,834 participants (*see* 2024 Form 5500 for the Group Plan, at 2), and the Welfare Plan had 18,834 participants. *See* 2024 Form 5500 for the Welfare Plan, at 2.

28. Plaintiffs' claims are typical of the claims of the members of the Class. Like other Class members, Plaintiffs participated in the Plans and were participants in voluntary benefit products that were selected and administered with the involvement of Defendant. Plaintiffs have suffered injuries as a result of Defendant's mismanagement of the Plans. Defendant treated Plaintiffs consistently with other Class members. Plaintiffs' claims and the claims of all Class members arise out of the same conduct, policies, and practices of Defendant as alleged herein, and all members of the Class have been similarly affected by Defendant's wrongful conduct.

29. There are questions of law and fact common to the Class, and these questions predominate over questions affecting only individual Class members. Common legal and factual questions include, but are not limited to:

---

[4] Plaintiffs reserve the right to propose other or additional classes or subclasses in this motion for class certification or subsequent pleadings in this action.

A. Whether Defendant is/was a fiduciary of the Plans;

B. Whether Defendant breached its fiduciary duty of loyalty by engaging in the conduct described herein;

C. Whether Defendant committed prohibited transactions by engaging in the conduct described herein;

D. The proper form of equitable and injunctive relief; and

E. The proper measure of monetary relief.

30. Plaintiffs will fairly and adequately represent the Class and have retained counsel experienced and competent in the prosecution of ERISA class action litigation. Plaintiffs have no interests antagonistic to those of other members of the Class. Plaintiffs are committed to the vigorous prosecution of this action and anticipate no difficulty in the management of this litigation as a class action.

31. This action may be properly certified under Rule 23(b)(1). Class action status in this action is warranted under Rule 23(b)(1)(A) because prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendant. Class action status is also warranted under Rule 23(b)(1)(B) because prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to individual members of the Class that, as a practical matter, would be dispositive of the interests of other members not parties to this action, or that would substantially impair or impede their ability to protect their interests.

32. In the alternative, certification under Rule 23(b)(2) is warranted because the Defendant has acted or refused to act on grounds generally applicable to the Class, thereby making

appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole.

## V. DEFENDANT HAS BEEN ENGAGING IN PROHIBITED SELF-DEALING WITH THE PLANS

### A. The Plans

33. In addition to traditional employee welfare benefits, employers often provide their employees with the opportunity to purchase voluntary benefits, such as life insurance, vision, long-term disability, accidental death and dismemberment, legal, and other similar coverages. Unlike traditional benefits, which are usually subsidized by the employer, the entire cost of these voluntary benefits is paid by the employee through a payroll deduction.

34. Voluntary benefits have existed for decades, but recent market trends indicate that employers increasingly offer voluntary benefits "because they allow employers to expand the benefits package without absorbing significant direct cost, while giving employees options that feel relevant to their specific needs and life stage."[5]

35. Employers who sponsor voluntary benefits plans must comply with ERISA unless the plans qualify for the Department of Labor's specific "safe harbor" exemption.[6] "For a benefit to be exempt from ERISA as a voluntary benefit, the benefit must meet each of the following requirements:

1. No contributions are made by the employer;

---

[5] Selerix, *9 Employee Benefits Trends Shaping 2026* (July 10, 2026), https://selerix.com/blog/trends-in-employee-benefits/.

[6] *See* Grace Elliot & Laura L. Ferguson, *Are Your 'Voluntary Benefits' Really Exempt From ERISA? It's Worth Checking* (Apr. 22, 2026), https://www.troutman.com/insights/are-your-voluntary-benefits-really-exempt-from-erisa-its-worth-checking/.

2. Participation in the benefit program is completely voluntary for employees;

3. The only function the employer provides is, without 'endorsing' the program: (i) permitting the insurer of the plans to publicize the program to employees or members, (ii) collecting premiums through payroll deductions, and (iii) remitting those premiums to the insurer; and

4. The employer receives no consideration — in the form of cash or otherwise — in connection with the benefit program, other than reasonable compensation for administrative services actually rendered in connection with payroll deductions or dues checkoffs.[7] The employer may not make any profit from providing such administrative services."[8]

*Id*.

36. To escape ERISA coverage, an employee-funded, voluntary benefit program must strictly satisfy all four prongs of the Department of Labor's Safe Harbor Exemption under 29 C.F.R. § 2510.3-1(j). If an employer or plan sponsor fails to maintain absolute neutrality under even a single prong, the safe harbor instantly collapses, and the plan falls under ERISA jurisdiction by operation of law.

37. First, Defendant systematically violated prong 3 of the Safe Harbor (the no-endorsement requirement). Defendant did not remain a neutral actor. Instead, Defendant intentionally bundled these high-commission voluntary products directly into its corporate infrastructure and corporate-branded Benefits Handbooks (Exhibits A through L, discussed *infra*).

[7] *See* Labor Regulation § 2510.3-1(j).

[8] Elliot & Ferguson, *supra*.

By structurally blending and tying these voluntary products alongside traditional, employer-subsidized involuntary benefits under a single Marsh McLennan banner, Defendant actively endorsed these plans to its captive workforce therefore losing safe harbor eligibility.

38. Second, Defendant disqualified itself from safe harbor eligibility under prong 4 of the Safe Harbor (the no-consideration requirement). Prong 4 strictly mandates that the employer or plan sponsor may receive zero consideration, cash, financial incentives, or profit in connection with the voluntary program. Defendant did not operate this program at a break-even administrative cost. Instead, Defendant utilized its unchecked corporate power over its own employees' plans to collect and retain $6,978,460 in total internal commissions and supplemental administrative fees, thus disqualifying itself from safe harbor protection.

39. Under the Department of Labor's Plan Asset Regulation, 29 C.F.R. § 2510.3-102(a)(1), participant contributions withheld by an employer from wages become plan assets by operation of law as of the earliest date they can reasonably be segregated from the employer's general assets. Because the final premium rates charged to employees were a direct, inverted mathematical function of Defendant's self-dictated corporate commission demands, the funds deducted from Plaintiffs' paychecks constituted Plan assets the exact microsecond they were segregated from general corporate payroll accounts. Defendant used its fiduciary authority to cause the Plans to accept these artificially inflated premiums, effectively intercepting segregated Plan assets to fund its own corporate bottom line before routing the remainder to the pass-through insurance carriers.

40. Marsh concedes through the filing of the Plans' Form 5500s that the Plans are subject to ERISA. *See* 2024 Form 5500s for the Plans, at 1 ("This form is required to be filed for

employee benefit plans under sections 104 and 4065 of the Employee Retirement Income Security Act of 1974 (ERISA) …").

41. In sum, Marsh exercised discretionary, authority and control over the management and administration of the voluntary benefits program, including by establishing the voluntary benefits program, selecting and retaining itself as the primary broker for the voluntary benefits program, promoting the voluntary benefits program during annual open enrollment through company-wide communications and enrollment materials distributed to employees in its, *inter alia*: 1) Benefits Handbook Date January 1, 2026, Administrative Information Marsh McLennan (Exhibit A); 2) Benefits Handbook Date January 1, 2026, Basic Life Insurance Plan Marsh McLennan (Exhibit B); 3) Benefits Handbook Date January 1, 2026, Basic Long Term Disability Marsh McLennan (Exhibit C); 4) Benefits Handbook Date January 1, 2026, Disability Coverage Marsh McLennan (Exhibit D); 5) Benefits Handbook Date January 1, 2026, Employee Programs and Policies Marsh McLennan (Exhibit E); 6) Benefits Handbook Date January 1, 2026, Group Variable Universal Life (GVUL) Insurance Plan Marsh McLennan (Exhibit F); 7) Benefits Handbook Date January 1, 2026, Individual Disability Insurance Plan Marsh McLennan (Exhibit G); 8) Benefits Handbook Date January 1, 2026, Insurance Benefits Marsh McLennan (Exhibit H); Benefits Handbook Date January 1, 2026, Legal Assistance Plan Marsh McLennan (Exhibit I); Benefits Handbook Date January 1, 2026, Optional Long Term Disability Marsh McLennan (Exhibit J); Benefits Handbook Date January 1, 2026, Vision Care Plan Marsh McLennan (Exhibit K); and Benefits Handbook Date January 1, 2026, Voluntary AD&D Plan Marsh McLennan (Exhibit L).

42. Marsh's actions in recommending, selecting, and retaining insurers and products; structuring and receiving compensation tied to participant-paid premiums; and influencing plan administrative processes with respect to voluntary benefits, all constitute fiduciary conduct.

43. Further, through its actions, Marsh has endorsed the services provided under the Plans, thus subjecting its actions, and the Plans themselves, to governance under ERISA.

### B. Marsh Had/Has Fiduciary Responsibilities Concerning the Administration of the Voluntary Benefit Plans

44. An entity "is a fiduciary with respect to a plan" if it "has any discretionary authority or discretionary responsibility in the administration of such plan." 29 U.S.C. § 1002(21)(A).

45. Under ERISA, employers have a duty to select insurers for their employees with care. *Radford Tr. v. First UNUM Life Ins. Co. of Am.*, 321 F. Supp. 2d 226, 249 (D. Mass. 2004).

46. Plan sponsors who choose service providers for a plan have a fiduciary duty to diligently and prudently select such providers, including voluntary insurance benefit administrators. *See Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 114 (2008) (describing the process of "buy[ing] insurance for others" in an ERISA-governed plan, including selecting an administrator and evaluating rates and claims processing ability); *see also* 29 U.S.C. § 1002(21) (stating that a fiduciary is one who exercises "discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets").

47. Marsh, in addition to being the Plan administrator, held itself out as the broker and consultant for the Plans with respect to the selection, marketing, and placement of voluntary benefit products, including soliciting proposals, evaluating carriers, recommending products, negotiating terms, facilitating enrollment, and arranging compensation structures.

48. In performing these functions, Marsh exercised discretionary authority and control over plan management and/or plan assets, rendered advice for a fee or other compensation with respect to the selection and retention of insurers and products, and had discretionary responsibility in plan administration related to voluntary benefits.

49. Marsh arranged, received, and retained compensation in the form of commissions and other consideration embedded in participant-paid premiums. *See* Schedule A's attached to 2020-2024 Form 5500s for the Plans.

50. The commissions and administration fees paid to Marsh were tied to the volume or amount of participant-paid premiums, and were paid by parties dealing with the plan – namely the insurance carriers – in connection with transactions involving plan assets.

51. Pursuant to the Department of Labor's Plan Asset Regulation, 29 C.F.R. § 2510.3-102(a)(1), the assets of an ERISA plan include amounts that a participant has withheld from his or her wages by an employer for contribution to the plan. Under this explicit regulatory command, these payroll deductions become plan assets as of the earliest date on which such contributions can reasonably be segregated from the employer's general assets.

52. At the exact moment a plan sponsor segregates participant premium contributions from its general corporate payroll accounts, those funds transform into ERISA plan assets by operation of law. These plan assets are dedicated exclusively to providing benefits and defraying reasonable plan administration expenses under 29 U.S.C. § 1103(c)(1).

53. Marsh did not merely negotiate a separate arm's-length commercial fee with insurance carriers out of independent corporate funds. Instead, because the participant-paid premium rates were a direct mathematical function of Marsh's compensation demands, the plan assets deducted from Plaintiffs' paychecks were artificially inflated. Consequently, when those

segregated plan assets were routed, whether through a dedicated plan trust account, a third-party administrator clearing account, or directly to the carrier, Marsh intercepted and extracted its compensation directly from funds that retained their character as plan assets.

54. Marsh, while acting with respect to the management or disposition of Plan assets, engaged in self-dealing by setting, collecting, and retaining commission compensation and administration fees out of Plan assets, in contravention of ERISA.

55. Marsh failed to avoid self-dealing and conflicts of interest, and failed to ensure that any compensation received from dealing with the Plans complied with ERISA's strict prohibitions under 29 U.S.C. § 1106(b), including by obtaining appropriate authorization and ensuring that any compensation did not result from Marsh acting in any transaction involving the Plans on behalf of a party whose interests were adverse to those of the Plans and their participants.

56. Marsh's compensation structure and receipt of commissions and administration fees influenced or had the tendency to influence its recommendations and actions regarding the selection, marketing, and placement of voluntary benefits, and the level and cost of those benefits to participants.

57. Plaintiffs and other participants elected certain voluntary benefits and paid premiums through payroll deductions, which constituted plan assets because participant contributions were held by or on behalf of the Plans for the purpose of providing benefits and defraying reasonable Plan administrative expenses.

58. Marsh did not simply receive a commission independently determined and paid by the carrier from general assets. Upon information and belief: Marsh determined or negotiated the compensation it would receive; the carrier incorporated that compensation into the premium quoted to the Plan; Marsh, acting as the Plans' fiduciary responsible for carrier/product selection,

then caused the Plans to accept the resulting premium; participants' payroll contributions funded that premium; and the carrier remitted the predetermined portion of those payments to Marsh. The premium deducted from participants' wages therefore included an identifiable economic charge attributable to Marsh's compensation.[9]

59. The conflict inherent in this arrangement was direct. In negotiating or selecting a voluntary benefit program, Marsh had a fiduciary interest in obtaining favorable terms and lower costs for Plan participants, while simultaneously having a corporate financial interest in maximizing the commissions and fees payable to itself. To the extent a carrier incorporated Marsh's requested compensation into the premium, reducing Marsh's compensation would reduce the amount that had to be recovered through participant premiums, all else being equal.

60. ERISA required Marsh to resolve that conflict in favor of the Plans and their participants and prohibited Marsh from using fiduciary authority over Plan transactions to generate additional compensation for itself. Marsh instead selected and retained arrangements under which it received compensation tied to the participant-funded insurance products over which it exercised fiduciary authority.

61. Marsh failed to avoid self-dealing and conflicts of interest, and failed to ensure that any compensation received from parties dealing with the plan complied with ERISA's strict prohibitions under 29 U.S.C. § 1106(b), such as by obtaining appropriate authorization and

---

[9] Nevertheless, even if an insurance carrier obtained title to premium amounts before remitting Marsh's commission, ERISA § 406(b)(3) separately prohibits a fiduciary from receiving consideration for its own account from a party dealing with the Plans in connection with a transaction involving Plan assets. The commissions alleged here were paid by the insurance carriers because of, and in connection with, the Plan insurance transactions and the participant contributions which were used to purchase the insurance coverage.

ensuring that any compensation did not result from Marsh acting in any transaction involving the Plans on behalf of a party whose interests were adverse to those of the Plans and their participants.

62. Defendant's compensation structure and receipt of commissions and fees influenced or had the tendency to influence its recommendations and actions regarding the selection, marketing, and placement of voluntary benefits, and the level and cost of those benefits to participants

63. No independent Plan fiduciary is identified in the Plans' Form 5500 filings or participant materials as having independently negotiated, approved, or monitored Marsh's broker compensation for the challenged voluntary-benefit products. Plaintiffs allege, on information and belief, that Marsh did not establish an effective independent-fiduciary process to determine whether Marsh should receive compensation from these transactions or, if so, the amount and structure of such compensation

**C. Marsh's Voluntary Benefits Program**

64. At the start of the Class Period, the Group Plan had 18,402 participants (*see* 2020 Form 5500 for the Group Plan, at 2) and the Welfare Plan had 19,731 participants. *See* 2020 Form 5500 for the Welfare Plan, at 2.

65. By 2024, the Group Plan had 18,834 participants (*see* 2024 Form 5500 for the Group Plan, at 2), and the Welfare Plan had 18,834 participants. *See* 2024 Form 5500 for the Welfare Plan, at 2.

66. The insurance carriers for the voluntary benefits have remained the same since the start of the Class Period, and in some instances, well before the Class Period.

67. As discussed above, and at all relevant times, Marsh acted as a fiduciary of the voluntary benefits program.

68. During the Class Period, Marsh, directly or through affiliated entities, received broker commissions and administration fees in amounts identified in the table below.

| Plan Year | Commissions Paid | Administration Fees Paid | Total Commission and Administration Fees Paid |
|---|---|---|---|
| 2024 | $1,236,275 | $191,223 | $1,427,498 |
| 2023 | $1,210,224 | $186,507 | $1,396,731 |
| 2022 | $1,299,251 | $192,345 | $1,491,596 |
| 2021 | $1,203,047 | $159,122 | $1,362,169 |
| 2020 | $1,181,054 | $119,412 | $1,300,466 |
| **TOTAL** | **$6,129,851** | **$848,609** | **$6,978,460** |

**1. Marsh Committed Prohibited Transactions and Breached its Fiduciary Duties by Selecting the Life Insurance Plan for the Welfare Plan**

69. At all relevant times, Marsh acted as a fiduciary by administering and selecting the life insurance voluntary insurance policies available to participants in the Welfare Plan.

70. Since 2012, Metropolitan Life Insurance Company was the insurance carrier for the life insurance voluntary insurance policy in the Welfare Plan.

71. Since 2012, commission and/or fees were paid from the employee paid premiums for the life insurance voluntary insurance policy.

72. As demonstrated in the table below, and starting in 2012 and continuing to 2024, Marsh and/or its affiliates received commissions and administration fees for the life insurance voluntary benefits plan in the Welfare Plan.

| Plan Year | Life Insurance Plan Participants | Amt. Commissions Paid | Amt. Administration Fees Paid[10] | Total Commission and Administration Fees Paid[11] | Total Premium |
|---|---|---|---|---|---|
| 2024 | 7,299 | $743,468 | $167,454 | $910,922 | $11,120,492 |
| 2023 | 7,812 | $702,796 | $166,479 | $869,275 | $9,423,109 |
| 2022 | 8,098 | $766,930 | $169,493 | $936,423 | $9,858,407 |
| 2021 | 8,636 | $695,818 | $133,809 | $829,627 | $9,858,407 |
| 2020 | 9,024 | $703,288 | $110,763 | $814,051 | $9,576,150 |
| 2019 | 9,511 | $685,103 | $65,030 | $750,133 | $9,576,150 |
| 2018 | 10,495 | $625,117 | $68,347 | $693,464 | $9,403,553 |
| 2017 | 11,457 | $673,085 | $73,691 | $746,776 | $9,403,553 |
| 2016 | 12,297 | $668,918 | $51,227 | $720,145 | $9,403,553 |
| 2015 | 13,893 | $556,724 | $0 | $556,724 | $7,823,538 |
| 2014 | 10,896 | $75,000 | $107,921 | $182,921 | $6,957,648 |
| 2013 | 10,686 | $75,000 | $132,982 | $207,982 | $562,884 |
| 2012 | 10,906 | $75,000 | $77,628 | $152,628 | $485,493 |
| **TOTAL** | | **$7,046,247** | **$1,324,824** | **$8,371,071** | |

73. Interestingly, when commissions were paid to Marsh Insurance and Investments Corp. starting in 2015, the commissions increased from $75,000 to over one-half million dollars.

74. The total amount of commissions paid to Marsh Insurance and Investments Corp. from 2020 to 2024 were $3,612,300 and the total amount of administration fees paid to Marsh Insurance and Investments Corp. from 2020 to 2024 were $747,998.

**2. Marsh Committed Prohibited Transactions and Breached its Fiduciary Duties by Selecting the Vision Plan in the Group Plan**

---

[10] From 2012 through 2024, the administration fee was identified as either Supplemental Compensation or Non-Monetary Compensation, or both, in the Form 5500s.

[11] In 2012 and 2013, the commissions and administration fees were paid to Seabury & Smith Inc. Seabury & Smith Inc. operated as a direct subsidiary of Marsh & McLennan Companies, Inc. In 2014, Seabury & Smith, Inc. was rebranded to Mercer Consumer under Mercer Health & Benefits Administration LLC. In 2014, some commissions and administration fees were paid to Seabury & Smith Inc. The remaining commissions and administration fees were paid to Mercer Health & Benefits Administration LLC. Starting in 2015 and continuing to 2024, the commissions and administration fees were paid to Marsh Insurance and Investments Corp., a legal entity under Marsh & McLennan Companies, Inc.

75. At all relevant times, Marsh acted as a fiduciary by administering and selecting the vision voluntary insurance policies available to participants in the Group Plan.

76. From 2011 through 2024, Vision Service Plan was the insurance carrier for Marsh's vision voluntary insurance policies.

77. From 2011 to 2024, no administration fees were paid to Marsh or any of its affiliates. From 2011 to 2014 no commissions were paid to Marsh or any of its affiliates.

78. However, starting in 2015, commissions were paid to Mercer Health and Benefits, LLC.[12]

79. As demonstrated in the table below, and starting in 2015 and continuing to 2024, Marsh and/or its affiliates received commissions for the vision voluntary benefits plan.

| **Plan Year** | **Vision Plan Participants** | **Amt. Commissions Paid** | **Total Premium**[13] |
|---|---|---|---|
| 2024 | 12,472 | $260,873 | $2,609,562 |
| 2023 | 12,631 | $239,538 | $2,616,549 |
| 2022 | 12,803 | $262,007 | $2,616,794 |
| 2021 | 12,684 | $258,605 | $2,587,441 |
| 2020 | 12,274 | $232,835 | $2,548,466 |
| 2019 | 12,222 | $234,886 | $2,555,107 |
| 2018 | 12,434 | $258,700 | $2,587,005 |
| 2017 | 12,734 | $275,780 | $2,757,803 |
| 2016 | 12,383 | $278,335 | $2,783,354 |
| 2015 | 12,402 | $281,030 | Unknown |
| 2014 | 12,525 | $0 | $2,869,127 |
| 2013 | 12,254 | $0 | $2,190,481 |
| 2012 | 12,026 | $0 | $2,157,881 |
| 2011 | 12,388 | $0 | $2,196,381 |
| **TOTAL** | | **$2,582,589** | |

[12] Mercer Health & Benefits LLC is a wholly owned subsidiary and operating unit of Marsh & McLennan Companies, Inc.

[13] For "unknown" entries, the Schedule A attached to the Form 5500s did not identify the amount.

80. The total amount of commissions paid to Marsh or its affiliates from 2020 through 2024 were $1,253,858.

**3. Marsh Committed Prohibited Transactions and Breached its Fiduciary Duties by Selecting the Long-Term Disability and Accidental Death & Dismemberment Plan in the Group Plan**

81. At all relevant times, Marsh acted as a fiduciary by administering and selecting the long-term disability and accidental death & dismemberment voluntary insurance policies available to participants in the Group Plan.

82. Since 2011 and continuing to 2024, National Union Fire Insurance Company of Pittsburgh, PA was the insurance carrier for Marsh's long-term disability and accidental death & dismemberment voluntary insurance policies.

83. Mercer Health and Benefits, LLC collected commissions from the premiums paid by participants in the plan during that period of time.

84. The table below demonstrates the total commissions paid to Mercer Health and Benefits, LLC for the life insurance and accidental death & dismemberment voluntary insurance policy.

| Plan Year | LTD and AD&D Plan Participants | Amt. Commissions Paid | Total Premium |
|---|---|---|---|
| 2024 | 8,713 | $106,234 | $708,229 |
| 2023 | 9,186 | $138,782 | $925,213 |
| 2022 | 29,250 | $136,032 | $906,879 |
| 2021 | 10,047 | $130,763 | $871,755 |
| 2020 | 10,181 | $126,725 | $844,835 |
| 2019 | 10,308 | $147,626 | $984,174 |
| 2018 | 11,116 | $147,378 | $982,532 |
| 2017 | 11,574 | $145,600 | $970,664 |
| 2016 | 11,949 | $145,217 | $968,116 |
| 2015 | 11,584 | $144,964 | $966,426 |
| 2014 | 8,097 | $152,962 | $1,019,747 |

| | | | |
|---|---|---|---|
| 2013 | Unknown | $143,980 | $959,869 |
| 2012 | 9,328 | $130,614 | $870,758 |
| **TOTAL** | | **$1,929,794** | |

85. The total amount of commissions paid to Marsh or its affiliates from 2020 through 2024 were $638,536.

86. Interestingly, the percentage of the premiums that were paid to Marsh, or its affiliates from 2012 to 2024 was exactly 15%.

**4. Marsh Committed Prohibited Transactions and Breached its Fiduciary Duties by Selecting the Accidental Death & Dismemberment Plan in the Group Plan**

87. At all relevant times, Marsh acted as a fiduciary by administering and selecting the accidental death & dismemberment voluntary insurance policies available to participants in the Group Plan.

88. Since 2011 and continuing to 2024, National Union Fire Insurance Company of Pittsburgh, PA was the insurance carrier for Marsh's accidental death & dismemberment voluntary insurance policies.

89. Mercer Health and Benefits, LLC collected commissions from the premiums paid by participants in the plan during that period of time.

90. The table below demonstrates the total commissions paid to Mercer Health and Benefits, LLC for the accidental death & dismemberment voluntary insurance policy.

| **Plan Year** | **AD&D Plan Participants** | **Amt. Commissions Paid** | **Total Premium** |
|---|---|---|---|
| 2024 | 32,212 | $41,782 | $208,910 |
| 2023 | 19,240 | $42,379 | $211,895 |
| 2022 | 19,244 | $42,379 | $211,895 |
| 2021 | 19,099 | $42,379 | $211,895 |
| 2020 | 18,402 | $56,099 | $280,493 |
| 2019 | 19,731 | $57,976 | $289,881 |

| | | | |
|---|---|---|---|
| 2018 | 23,325 | $57,976 | $289,881 |
| 2017 | 19,496 | $54,245 | $271,227 |
| 2016 | 19,150 | $54,245 | $271,227 |
| 2015 | 19,574 | $11,884 | $79,029 |
| 2014 | 8,097 | $54,886 | $274,430 |
| 2013 | 10,391 | $47,643 | $317,621 |
| 2012 | 9,328 | $47,538 | $316,917 |
| **TOTAL** | | **$660,498** | |

91. The total amount of commissions paid to Marsh or its affiliates from 2020 through 2024 were $225,018.

92. Interestingly, the percentage of the premiums that were paid to Marsh, or its affiliates from 2016 to 2024 was exactly 20%.

#### 5. Marsh Committed Prohibited Transactions and Breached its Fiduciary Duties by Selecting the Long-Term Disability Plan for the Group Plan

93. At all relevant times, Marsh acted as a fiduciary by administering and selecting the long-term disability voluntary insurance policies available to participants in the Group Plan.

94. Since 2011 and continuing to 2024, Hartford Life and Accident was the insurance carrier for Marsh's long-term disability voluntary insurance policies.

95. Mercer Health and Benefits, LLC collected commissions from the premiums paid by participants in the plan during that period of time, while Mercer Human Resource collected administration fees.

96. The table below demonstrates the total commissions paid to Mercer Health and Benefits, LLC and administration fees paid to Mercer Human Resource for the long-term disability voluntary insurance policy.

| **Plan Year** | **LTD Plan Participants** | **Amt. Commissions Paid** | **Amt. Administration Fees Paid[14]** | **Total Commission and Administration Fees Paid** | **Total Premium** |
|---|---|---|---|---|---|
| 2024 | 2,077 | $36,562 | $15,582 | $52,144 | $911,219 |
| 2023 | 2,090 | $35,563 | $14,383 | $49,946 | $886,337 |
| 2022 | 2,144 | $29,857 | $13,344 | $43,201 | $761,176 |
| 2021 | 2,334 | $33,765 | $13,385 | $47,150 | $784,307 |
| 2020 | 2,213 | $31,971 | $4,224 | $36,195 | $742,632 |
| 2019 | 2,275 | $31,441 | $13,067 | $44,508 | $730,339 |
| 2018 | 2,389 | $32,547 | $16,553 | $49,100 | $756,021 |
| 2016 | 216 | $37,053 | $12,399 | $49,452 | $69,870 |
| 2015 | 3,470 | $65,885 | $17,811 | $83,696 | $931,310 |
| 2014 | 3,668 | $0 | $14,606 | $14,606 | $1,052,522 |
| 2013 | 4,003 | $0 | $13,360 | $13,360 | $1,301,634 |
| 2012 | 3,171 | $0 | $7,484 | $7,484 | $913,452 |
| 2011 | 3,195 | $0 | $18,316 | $18,316 | $1,072,543 |
| **TOTAL** | | **$334,644** | **$184,571** | **$519,215** | |

97. The total amount of commissions paid to Marsh or its affiliates from 2020 through 2024 were $167,718 and the total amount of administration fees were $60,918.

### 6. Marsh Committed Prohibited Transactions and Breached its Fiduciary Duties by Selecting another Long-Term Disability Plan in the Group Plan

98. Since 2019, Marsh acted as a fiduciary by administering and selecting another long-term disability voluntary insurance policies available to participants in the Group Plan.

99. During that period of time, Provident Life and Casualty Insurance Company was the insurance carrier for the other long-term disability voluntary insurance policy.

100. Mercer Health and Benefits, LLC collected commissions from the premiums paid by participants in the plan during that period of time.

[14] From 2011 to 2014 and from 2020 to 2024, the administration fee was identified as Additional Compensation Paid in the Form 5500s. From 2015 to 2019, the administration fee was identified as Bonus Fees.

101. The table below demonstrates the total commissions paid to Mercer Health and Benefits, LLC for the other long-term disability voluntary insurance policy.

| **Plan Year** | **LTD Plan Participants** | **Amt. Commissions Paid** | **Total Premium** |
|---|---|---|---|
| 2024 | 40 | $16,500 | $114,873 |
| 2023 | 46 | $23,455 | $137,342 |
| 2022 | 47 | $35,474 | $145,256 |
| 2021 | 47 | $33,519 | $131,644 |
| 2020 | 41 | $29,662 | $92,532 |
| 2019 | 33 | $42,821 | $83,092 |
| **TOTAL** | | **$181,431** | |

102. The total amount of commissions paid to Marsh or its affiliates from 2020 through 2024 were $138,610.

**7. Marsh Committed Prohibited Transactions and Breached its Fiduciary Duties by Selecting the Legal Plan in the Group Plan**

103. From 2011 through 2024, Marsh acted as a fiduciary by administering and selecting the legal voluntary insurance policies available to participants in the Group Plan.

104. From 2011 through 2019, no commissions were paid in connection with the legal voluntary insurance policies. However, starting in 2020 and continuing to 2024, Mercer Health and Benefits received commission from the premiums paid for the legal voluntary insurance policies.

105. Also, from 2011 to 2018 no administration fees were paid in connection with the legal voluntary insurance policies. However, starting in 2019 and continuing to 2024, Mercer H&B Administration, LLC collected administration fees from the premiums paid for the legal voluntary insurance policies.

106. The table below demonstrates the total commissions and administration fees paid to Marsh or its affiliates for the legal voluntary insurance policy.

| Plan Year | Legal Plan Participants | Amt. Commissions Paid | Amt. Administration Fees Paid[15] | Total Commission and Administration Fees Paid | Total Premium |
|---|---|---|---|---|---|
| 2024 | 2,537 | $30,856 | $8,187 | $39,043 | $617,726 |
| 2023 | 2,382 | $27,711 | $5,645 | $33,356 | $554,981 |
| 2022 | 2,310 | $26,572 | $9,508 | $36,080 | $532,073 |
| 2021 | 2,386 | $8,198 | $11,928 | $20,126 | $573,173 |
| 2020 | 2,478 | $474 | $4,425 | $4,899 | $587,634 |
| 2019 | 2,478 | $0 | $50,000 | $50,000 | $542,076 |
| 2018 | 2,720 | $0 | $0 | $0 | $563,272 |
| 2016 | 2,496 | $0 | $0 | $0 | $524,879 |
| 2015 | 2,483 | $0 | $0 | $0 | $587,364 |
| 2014 | 2,661 | $0 | $0 | $0 | $556,193 |
| 2013 | 2,942 | $0 | $0 | $0 | $624,961 |
| 2012 | 2,792 | $0 | $0 | $0 | $596,298 |
| 2011 | 2,632 | $0 | $0 | $0 | $576,253 |
| **TOTAL** | | **$93,811** | **$89,693** | **$183,504** | |

107. The total amount of commissions paid to Marsh or its affiliates from 2020 through 2024 were $93,811 and the total amount of administration fees were $39,693.

### 8. Marsh and/or Its Affiliates Collected Millions of Dollars in Commissions and Administration Fees from Plan Participants During the Class Period

108. The table below demonstrates the total amount of commissions and administration fees Marsh or its affiliates received from the premiums paid by its employees who chose to participate in the various voluntary benefits plans in the Welfare Plan.

| Plan Year | Total Commissions Paid | Total Administration Fees Paid | Total Commissions and Administration Fees Paid |
|---|---|---|---|
| 2024 | $743,468 | $167,454 | $910,922 |
| 2023 | $702,796 | $166,479 | $869,275 |
| 2022 | $766,930 | $169,493 | $936,423 |

[15] From 2011 to 2014 and from 2020 to 2024, the administration fee was identified as Additional Compensation Paid in the Form 5500s. From 2015 to 2019, the administration fee was identified as Bonus Fees.

| | | | |
|---|---|---|---|
| 2021 | $695,818 | $133,809 | $829,627 |
| 2020 | $703,288 | $110,763 | $814,051 |
| **TOTAL** | **$3,612,300** | **$747,998** | **$4,360,298** |

109. The table below demonstrates the total amount of commissions and administration fees Marsh or its affiliates received from the premiums paid by its employees who chose to participate in the various voluntary benefits plans in the Group Plan.

| **Plan Year** | **Total Commissions Paid** | **Total Administration Fees Paid** | **Total Commissions and Administration Fees Paid** |
|---|---|---|---|
| 2024 | $492,807 | $23,769 | $516,576 |
| 2023 | $507,428 | $20,028 | $527,456 |
| 2022 | $532,321 | $22,852 | $555,173 |
| 2021 | $507,229 | $25,313 | $532,542 |
| 2020 | $477,766 | $8,649 | $486,415 |
| **TOTAL** | **$2,517,551** | **$100,611** | **$2,618,162** |

110. Marsh violated 29 U.S.C. § 1106(b)(1) by dealing with the assets of the Plans in its own interest or for its own account when it caused or allowed the payment of commissions and administration fees to itself derived from participant-paid premiums that were Plan assets or derived from transactions involving Plan assets.

111. Marsh violated 29 U.S.C. § 1106(b)(2) by acting in a transaction involving the Plans on behalf of a party whose interests were adverse to the interests of the Plans or their participants and beneficiaries, including insurers and other parties dealing with the Plans from whom Marsh received compensation tied to participant-paid premiums.

112. Marsh violated 29 U.S.C. § 1106(b)(3) by receiving consideration for its own personal account from parties dealing with the Plans in connection with transactions involving the assets of the Plans, including commissions and administration fees paid by insurance carriers and/or embedded in participant-paid premiums.

113. Marsh's receipt and retention of commissions and other consideration were not subject to any exemption applicable to fiduciaries engaged in self-dealing prohibited by § 1106(b), and, in any event, were not properly authorized, disclosed, or structured to satisfy ERISA's requirements.

114. Marsh's conduct was knowing, willful, or at least reckless, and undertaken in disregard of its fiduciary obligations of loyalty, resulting in excessive and undisclosed compensation and harm to the Plans and their participants.

115. As a direct and proximate result of Marsh's conduct, Plaintiffs and the Plans suffered losses, including but not limited to excessive charges embedded in premiums, diminished Plan and participant assets, and the loss of value and loyalty owed by a fiduciary operating free of self-dealing.

## COUNT I
## Prohibited Transactions and Self-Dealing in Violation of ERISA § 406(b), 29 U.S.C. § 1106(b)

116. Plaintiffs reallege and incorporate all prior paragraphs as if fully set forth herein.

117. Marsh, as a fiduciary to the Plans, was strictly prohibited from engaging in the self-dealing transactions enumerated under 29 U.S.C. § 1106(b).

118. Marsh violated ERISA § 406(b)(1), 29 U.S.C. § 1106(b)(1) by dealing with the assets of the Plans in its own interest and for its own corporate account. Specifically, Defendant used its fiduciary power to authorize and mandate premium rate deductions from its employees' wages that were mathematically designed to contain and fund Defendant's own self-dictated corporate commission and fee margins.

119. Marsh violated ERISA § 406(b)(2), 29 U.S.C. § 1106(b)(2) by acting in transactions involving the Plans on behalf of parties whose interests were adverse to the Plans, their

participants, and beneficiaries. Specifically, Marsh acted on behalf of its own corporate brokerage and consulting arms – and the complicit insurance carriers – to secure high-margin corporate commission revenues, creating a direct, structural conflict with its fiduciary obligation to secure the lowest possible premium costs for its employees.

120. Marsh violated ERISA § 406(b)(3), 29 U.S.C. § 1106(b)(3) by receiving substantial consideration for its own personal account from third-party insurance carriers dealing with the Plans in connection with transactions involving Plan assets.

121. As a result of these violations, Marsh is strictly liable under 29 U.S.C. § 1132(a)(2) and/or (a)(3) for appropriate equitable relief, including restitution, disgorgement of all compensation and profits, surcharge, and injunctive and other equitable relief.

**COUNT II**
**Breaches of Fiduciary Duty of Loyalty**

122. Plaintiffs reallege and incorporate by reference the foregoing allegations.

123. In addition to the above and/or in the alternative, as a fiduciary of the Plans, Marsh breached its fiduciary duty of loyalty by placing its own interests in receiving commissions ahead of the interests of the Plans and participants, failing to avoid prohibited conflicts, and failing to act solely in the interest of participants and beneficiaries for the exclusive purpose of providing benefits and defraying reasonable plan administrative expenses.

124. As a fiduciary of the Plans, Marsh was subject to the fiduciary duties imposed by ERISA § 404(a), 29 U.S.C. § 1104(a).

125. Pursuant to 29 U.S.C. § 1104(a)(1)(A), Marsh was required to discharge its duties to the Plans "solely in the interest of the participants and beneficiaries" and "for the exclusive purpose of: (i) providing benefits to participants and their beneficiaries; and (ii) defraying reasonable expenses of administering the plan."

126. As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plans suffered millions of dollars in losses.

127. Pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2), Marsh is liable to restore to the Plans all losses caused by its breaches of fiduciary duties, and also must restore any profits resulting from such breaches. In addition, Plaintiffs are entitled to equitable relief and other appropriate relief for Defendant's breaches as set forth in their Prayer for Relief.

128. Plaintiffs seek equitable relief under 29 U.S.C. § 1132(a)(2) and/or (a)(3), including restitution, disgorgement, surcharge, injunctive relief, removal of Defendant from any fiduciary role, appointment of an independent fiduciary, accounting, and other appropriate equitable remedies.

## PRAYER FOR RELIEF

129. WHEREFORE, Plaintiffs pray that judgment be entered against Defendant on all claims and requests that the Court awards the following relief:

A. A determination that this action may proceed as a class action under Rule 23(b)(1), or in the alternative, Rule 23(b)(2) of the Federal Rules of Civil Procedure;

B. Designation of Plaintiffs as Class Representatives and designation of Plaintiffs' counsel as Class Counsel;

C. A Declaration that the Defendant has breached its fiduciary duties under ERISA;

D. An Order compelling the Defendant to make good to the Plans all losses to the Plans resulting from Defendant's breaches of its fiduciary duties, and to restore to the Plans all profits the Defendant made through use of the Plans' assets, and to restore to the Plans all profits which the participants would have made if the Defendant had fulfilled its fiduciary obligations;

E. An order requiring the Company to disgorge all profits received from, or in respect of, the Plans, and/or equitable relief pursuant to 29 U.S.C. § 1132(a)(3) in the form of an accounting for profits, imposition of a constructive trust, as necessary to effectuate said relief, and to prevent the Company's unjust enrichment;

F. Actual damages in the amount of any losses the participants suffered, to be allocated among the participants in proportion to their losses;

G. An order enjoining Defendant from any further violations of its ERISA fiduciary responsibilities, obligations, and duties;

H. Other equitable relief to redress the Company's illegal practices and to enforce the provisions of ERISA as may be appropriate, including appointment of an independent fiduciary or fiduciaries to run the Plans and removal of Plan fiduciaries deemed to have breached their fiduciary duties;

I. An award of pre-judgment interest;

J. An award of costs pursuant to 29 U.S.C. § 1132(g);

K. An award of attorneys' fees pursuant to 29 U.S.C. § 1132(g) and the common fund doctrine; and

L. Such other and further relief as the Court deems equitable and just.

Dated: September 25, 2026

Respectfully submitted,

*/s/ Mark K. Gyandoh*
Mark K. Gyandoh, Esquire
PA Attorney ID #88587
James A. Maro, Esquire
PA Attorney ID #86420
(*Admissions Pro Hac Vice to be Requested)*
**CAPOZZI ADLER, P.C.**
312 Old Lancaster Road
Merion Station, PA 19066
Email: markg@capozziadler.com

jamesm@capozziadler.com
Tel.: (610) 890-0200
Fax: (717) 232-3080